UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

United States Courts
Southern District of Texas
F I L E D

JUN 2 1 2023

Nathan Ochsner, Clerk of Court

CHRISTOPHER LACCINOLE
*Plaintiff*

Vs.                                C.A. No.:

ALBERT JOSEPH NIZICK JR,
&
POSC PAC d/b/a POLICE OFFICERS         JURY TRIAL REQUESTED
SUPPORT COMMITTEE,
&
DOES 1-10, inclusive
*Defendants*

## COMPLAINT

### I. INTRODUCTION

This is a civil action about a man, Al Nizick, who runs a scam 527 political action committee (PAC) to fleece consumers of money for an ostensibly noble cause, while Nizick pockets the money for himself and his fundraisers. In order to obtain money, Defendants place unauthorized robocalls to consumers like Plaintiff using an artificial or prerecorded voice on behalf of "Police Officers Support Committee." In these calls, Defendants repeatedly claim that the money "goes to pay for the officers' service." In reality, none of the money goes to police officers.

Recently, media outlets reported that these scams have become so bad that the Federal Election Commission finally took action in an extremely rare bipartisan effort to urge legislation to stop SCAM PACS: "In a rare case of bipartisan unity, the Federal Election Commission this week unanimously urged lawmakers to tackle so-called "scam PACs" that claim to support a political candidate but end up enriching the founders and

1

their friends."[1]

In order to circumvent any oversight or accountability, Defendants Nizick and POSC refused to register or make any reports to the Federal Election Commission (FEC). Furthermore, even though Defendants claim their business is headquartered in Virginia, they never registered for a business license in Virginia. This is deliberate. Defendants want to conceal their misdeeds and hamstring any compliance regime. Despite POSC's promise to help officers, **not one penny of the money goes to help police officers.** Where do all these millions of dollars go? Back to Nizick, and his fundraisers. This needs to stop.

## II. NATURE OF THE ACTION

1. Defendants Nizick and POSC PAC solicit consumers to pay for police officers' services. As a primary part of their marketing efforts, Defendants placed thousands of calls employing an artificial or prerecorded voice message to cell phones and residential phones nationwide.

2. In 2013, the FCC required prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers and residential lines. Specifically, it ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates.[] In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service."

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1844 (2012) (footnotes omitted) ("the FCC Letter").

---

[1] See https://www.businessinsider.com/fec-asks-congress-to-take-action-on-scam-pacs-2022-12. Accessed June 16, 2023.

3. Defendants did not obtain consent prior to placing these calls and, therefore, are in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

4. The TCPA is a remedial statute that was passed to protect consumers from unwanted prerecorded telephone calls in response to complaints about increased telemarketing. See S. Rep. 102-178, at 1, 5 (1991).

5. Congress enacted the TCPA in 1991 to restrict telemarketing equipment that could target millions of consumers *en masse*. Congress found that these calls were not only a nuisance and an invasion of privacy to consumers specifically but were also a threat to interstate commerce generally. See S. Rep. No. 102-178, at 2-3 (1991).

6. Despite such strong legislation passed almost 30 years ago, this problem worsens with each year.

7. According to online robocall tracking service "YouMail," 5.1 billion robocalls were placed in May 2023 alone, at a rate of 164 million calls per day www.robocallindex.com (last visited June 16, 2023).

8. The FCC received an overwhelming number of complaints about unwanted calls, with 150,000 complaints in 2016, 185,000 complaints in 2017, 232,000 complaints in 2018, 192,000 complaints in 2019, 156,000 complaints in 2020, and 161,000 complaints in 2021. FCC, Consumer Complaint Data Center, www.fcc.gov/consumer-help-center-data.

9. "Unwanted calls – including illegal and spoofed robocalls - are the FCC's top consumer complaint and our top consumer protection priority." FCC press release, Cutting off Robocalls; (July 25, 2022), statement of FCC.

10. "The FTC receives more complaints about unwanted calls than all other complaints

combined." Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, CG Docket No. 02-278, at 2 (2016).

11. The TCPA targets unauthorized calls exactly like the ones alleged in this case, based on Defendants' use of technological equipment to spam consumers with their telephone solicitations on a grand scale.

12. By placing the calls at issue, Defendants have violated the privacy and statutory rights of Plaintiff.

13. Plaintiff therefore seeks an injunction requiring Defendants to stop their unconsented calling.

14. The Plaintiff brings this action alleging the Defendants violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 (hereinafter "TCPA"). The Plaintiff seeks statutory damages and injunctive relief under the TCPA.

15. The Plaintiff also alleges that Defendants' conduct violated the Texas Business and Commerce Code § 302.101 and § 305.053. The Plaintiff seeks statutory damages, costs, attorney's fees, and injunctive relief for each Defendant under Texas law.

16. Plaintiff has no pre-existing business relationship with the Defendants and never requested by an agreement or otherwise that he be contacted.

17. Any violations by Defendants were knowing, willful, intentional, and Defendants did not maintain procedures reasonably adapted to avoid any such violation.

## III. JURISDICTION AND VENUE

18. This Court has jurisdiction to hear the TCPA claims in this matter pursuant to 47 U.S.C. § 227(b)(3) and 47 U.S.C. § 227(c)(5).

19. This Court has jurisdiction to hear Plaintiff's state law claims pursuant to Tex. Bus. & Com. Code § 17.50.
20. This Court has personal specific jurisdiction over Defendants because Defendants targeted consumers with their solicitations in Texas, including to Plaintiff, who resides in this District.
21. Defendants' marketing towards residents of Texas is the subject of this dispute from which this lawsuit arises.
22. Venue in this County is proper pursuant to 47 U.S.C. § 227(b)(3) and 47 U.S.C. § 227(c)(5) because the Plaintiff is a resident of this District and the conduct complained of took place in this District.

## IV. PARTIES

23. The Plaintiff is a natural person and is a resident of the Southern District of Texas.
24. Plaintiff is a person as that term is defined or referenced by 47 U.S.C. § 153(39).
25. Plaintiff is a "purchaser" as that term is defined Texas Business and Commerce Code § 302.001(3).
26. Upon information and belief, Defendant Albert Nizick ("Nizick") is a natural person and Treasurer of Defendant POSC PAC ("POSC").
27. Defendant Nizick is a person as that term is defined or referenced by 47 U.S.C. § 153(39).
28. Defendant POSC PAC is a person as that term is defined or referenced by 47 U.S.C. § 153(39).
29. Defendant POSC PAC is an unknown business entity but POSC PAC reports to the IRS that its principle place of business is 14497 Potomac Mills Rd #1158,

Woodbridge, VA 22192. (See Exhibit A of Defendants' IRS filing in January 2023).

30. This principle place of business for POSA PAC is actually a Staples retail store in Woodbridge, Virginia.

31. Upon information and belief, Defendant Nizick may be served at his residence at 16020 Lockwood Ave, Oak Forest, IL, 60452.

32. Does 1-10 (the "Agents") are individual employees and/or agents employed by Defendants and whose identities are currently unknown to the Plaintiff. One or more of the Agents may be joined as parties once their identities are disclosed through discovery.

33. Defendants at all times acted by and through one or more of the Agents.

## V. FACTUAL ALLEGATIONS

34. Defendant Nizick solicits money to pay for police officers, but keeps the money for himself and his fundraisers.

35. Defendant "POSC PAC" masquerades as a legitimate business entity to solicit for Nizick's scam. Nizick directs POSC PAC to place telephone solicitations to consumers for police services.

36. To increase their revenue and avoid paying for legitimate forms of advertising and telemarketing, Nizick hired and directed John Doe to market POSC PAC and produce inbound calls.

37. John Doe amassed a list of thousands of phone numbers from unknown sources that were believed to be consumer telephone numbers.

38. John Doe called and played artificial or prerecorded voice messages to thousands of cellular and residential phones at a time.

39. When Plaintiff answered expecting to hear from a real person, John Doe pulled a bait and switch by playing an artificial or prerecorded voice message.

40. Defendants respected Plaintiff's time and privacy so little that they did not even hire a real person to call him—they used a machine to play prerecorded messages to thousands of consumers at once.

41. Defendants hoped that if enough people paid for the "police officers' service" as a result of the robocalls, it would justify the annoyance experienced by the recipients of the calls as the "cost of doing business."

42. Defendants did not possess consent from Plaintiff as required prior to deploying these prohibited messages.

43. On April 17, 2023, at approximately 5:44 PM CT, Plaintiff received a call on his personal cellular telephone (which has a Texas area code) from the phone number (888) 832-0885.

44. When Plaintiff answered, he immediately heard a man's voice talking in a Southern accent.

45. Plaintiff recognized the man's voice because he has received multiple prerecorded voice calls with the same man's voice.

46. The man was speaking from a script and used the same voice, intonation, and rhythm for each call.

47. The man identified himself as "Derrick James" from the "Police Officers Support Committee."

48. The man asked Plaintiff for money to support police officers using the following prerecorded voice message:

7

> *"Hi, It's Derrick James from the Police Officer Support Committee. We're having our fundraising drive and the goal is to provide our police officers with advanced training programs and lifesaving equipment so they can better protect and serve our homes and our communities. So, we need to elect lawmakers that support these goals. Now, when you receive your donation return envelope, can we count on you to return a small contribution to the drive."*

49. The caller then transferred Plaintiff to yet another prerecorded voice message system to give the fraudulent appearance that Plaintiff was speaking to a live person.

50. In fact, Defendants transferred Plaintiff to a woman named "Allison."

51. Plaintiff recognized the voice of "Allison" because he has received multiple prerecorded voice calls with the same woman's voice.

52. The scripts from Allison used a prerecorded message to respond to an algorithm of consumer statements and responses.

53. During these calls, Plaintiff specifically asked, "Does the money go to pay for the officer's services?"

54. Each and every time, Defendants affirmed that the money from Plaintiff would pay for the police officer's services.

55. There is no Political Action Committee registered with the Federal Election Commission as "Police Officers Support Committee," or "POSC."

56. Defendants deliberately use a phony name to create confusion for consumers.

57. The beginning of the messages did not clearly state the identity of the business, individual, or other entity that is responsible for initiating the call to Plaintiff.

58. The messages did not clearly state the telephone number of such business, other entity, or individual.

59. The calls did not provide an automated, interactive voice- and/or key press-activated opt-out mechanism for the called person to make a do-not-call request.

60. Plaintiff was interested in the group so he provided his address to the automated system so that he could learn more about the organization since the prerecorded message did not provide the full name or phone number of the organization.

61. Plaintiff does not have any account or business with Defendants.

62. Plaintiff has no pre-existing business relationship with Defendants and never requested by an agreement or otherwise that he be contacted on his personal cellular telephone.

63. Plaintiff never provided his cellular telephone number to Defendants and never provided his consent to Defendants to be contacted on his cellular telephone.

64. At no time did the Plaintiff take any action to invite calls from Defendants.

65. At all times relevant to this Complaint, Plaintiff's phone number is part of the national Do Not Call registry.

66. Subsequent to the call from Defendants on April 17, 2023, Defendants called Plaintiff sixteen more times after that call.

67. Each call contained prerecorded voice that was identical to the other calls. It was obvious to any listener that the call was prerecorded because it includes the same sounding voice, with the exact same script, same rhythm, and same intonation.

68. Defendants placed seventeen (17) calls in total to Plaintiff's personal cellular telephone which has a Texas Area Code.

69. Defendants used artificial voice to call Plaintiff on his cellular telephone.

70. Defendants used prerecorded voice to call Plaintiff on his cellular telephone.

71. The Texas area code telephone number that Defendants used to contact Plaintiff was and is assigned to Plaintiff's cellular telephone service as specified in 47 U.S.C. §

227(b)(1)(A)(iii).

72. Plaintiff uses this phone for personal purposes, such as listening to music while exercising at home, enjoying weather apps, and to assist with cooking home meals.

73. Plaintiff's cellular telephone has a limited minutes plan, so that when Defendants call Plaintiff, they deplete the minutes on Plaintiff's plan.

74. Defendants did not initiate any call to Plaintiff's cellular telephone number for an emergency purpose.

75. Plaintiff incurred actual damages as a result of Defendants' behavior.

76. Defendants' phone calls harmed Plaintiff by causing the very harm that Congress sought to prevent—a "nuisance and invasion of privacy."

77. Defendants' phone calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone.

78. Defendants' phone calls harmed Plaintiff by trespassing upon and interfering with Plaintiff's rights and interests in Plaintiff's cellular telephone line.

79. Defendants' phone calls harmed Plaintiff by intruding upon Plaintiff's seclusion.

80. Defendants harassed Plaintiff by incessantly calling Plaintiff's telephone.

81. Defendants' phone calls harmed Plaintiff by causing Plaintiff aggravation and annoyance.

82. Defendants' phone calls harmed Plaintiff by wasting Plaintiff's time.

83. Defendants' phone calls harmed Plaintiff by depleting the battery life on Plaintiff's cellular telephone.

84. Defendants' phone calls harmed Plaintiff by using minutes allocated to Plaintiff by Plaintiff's cellular telephone service provider.

85. Defendants' phone calls harmed Plaintiff by using data storage space in Plaintiff's cellular telephone.

86. Defendants initiated the telephone calls and messages for the purpose of encouraging Plaintiff to pay for the services for the "police officers."

87. The telephone calls to Plaintiff's cellular telephone number were not initiated by accident or mistake.

88. Defendants did not have the required prior express consent from Plaintiff to place automated calls using an artificial or prerecorded voice to Plaintiff on his cellular telephone.

89. Defendants do not maintain a written policy for maintaining a do-not-call list.

90. Defendants have not informed and trained personnel engaged in making calls on the use of the do-not-call list.

91. Defendants do not have a registration certificate with the Texas Secretary of State to conduct telephone solicitations in Texas.

92. It is unfair for Defendants to call Plaintiff when Plaintiff listed his number on the Do Not Call Registry.

93. It is unfair for Defendants to call Plaintiff when Defendants lacked consent to call Plaintiff.

## VI. THEORIES OF LIABILITY AGAINST DEFENDANTS

94. Even if Nizick or POSC did not personally initiate the TCPA-violating calls, Nizick and POSC are liable because they took steps to cause the calls to be made, and the calls were made pursuant to their actual or apparent authority, and/or ratification. Further, Nizick and POSC are liable for participating in a joint enterprise or acting in

concert with John Doe.

95. Nizick is liable for the conduct of POSC and John Doe because he knows they are unlicensed and unregistered entities.

## DIRECT LIABILITY UNDER THE TCPA

96. Defendants' scheme involves the use of illegal robocalling to promote their solicitations.

97. John Doe is directly liable under the TCPA for calling Plaintiff's phone using an artificial or prerecorded voice.

98. Nizick and POSC are also directly liable under the TCPA for outsourcing their telemarketing to John Doe.

99. On May 9, 2013, the FCC confirmed this principle in a Declaratory Ruling holding that sellers may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.
> *In re Dish Network*, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

## VICARIOUS / AGENCY LIABILITY

100. The *Dish Network* FCC Ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and

12

immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 n. 107.

101. Prior to conducting discovery in this litigation, due to the anonymous nature of robocalling, Plaintiff has no way to identify the exact parties who called his phone. It could have been Nizick, POSC, or some other unknown company John Doe.

102. However, for the purposes of TCPA liability, Plaintiff is not expected to know this information at the pleading stage.

103. The *Dish Network* FCC Ruling states that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-593 (¶ 46). Moreover, evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 (¶ 46).

## ACTUAL AUTHORITY

104. Defendant Nizick and POSC gave actual authority to John Doe to generate prospective customers.

105. Robocalling was integrated seamlessly into their telephone solicitation process that it appeared to outside parties like Plaintiff that John Doe was the telemarketing department of Nizick and POSC.

106. Nizick and POSC acted in concert with John Doe and has been able to enjoy the benefits of mass robocalling while moving the illegal activity "outside their purview."

107. John Doe had actual authority to make robocalls to Plaintiff on behalf of Nizick and

POSC. This is further evidenced by the solicitation letters that Plaintiff received from Defendants.

108. The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." See *In re Rules & Regulations Implementing the TCPA*, CC Docket No. 92-90, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12397 (¶ 13) (1995).

109. In their January 4, 2008 ruling, the FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *Id.* (specifically recognizing "on behalf of" liability in the context of a prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

110. More specifically, the *Dish Network* FCC Ruling held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. 28 FCC Rcd at 6586 (¶ 34).

### APPARENT AUTHORITY

111. The *Dish Network* FCC Ruling further clarifies the circumstances under which a telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was

14

> violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.
>
> 28 FCC Rcd at 6592 (¶ 46).

112. Nizick and POSC authorized John Doe to generate prospective customers for them.

113. It appeared to Plaintiff that John Doe was one and the same company as Nizick and POSC.

114. Plaintiff reasonably believed and relied on the fact that John Doe had received permission and instructions from Nizick and POSC to solicit for police officer services.

## RATIFICATION

115. Defendants Nizick and POSC actively accepted business that originated through the illegal robocalls placed by John Doe.

116. By accepting a contract written with Plaintiff pursuant to a robocall, Nizick and POSC "manifest[ed] assent or otherwise consent[ed] . . . to act" on behalf of Defendant John Doe, as described in the Restatement (Third) of Agency.

117. Nizick and POSC ratified John Doe's TCPA violations by knowingly accepting the benefit of Plaintiff as a new customer despite the way Plaintiff was the victim of Defendants' illegal marketing scheme.

118. POSC permitted their salespeople to solicit prospective customers for Nizick, including Plaintiff, while turning a blind eye to the illegal way in which the potential customer was identified.

119. Nizick and POSC ratified John Doe's TCPA violations by being willfully ignorant of the violations or by being aware that such knowledge was lacking.

120. The ratification by Nizick and POSC caused John Doe to have actual authority

under Restatement § 4.01 cmt. b.

## JOINT ENTERPRISE

121. Nizick and POSC had a tacit agreement or approved of after the fact with John Doe for the sale of police officer services pursuant to John Doe's illegal robocalls.

122. Defendants were part of a common enterprise and had a community of interest in soliciting police officer services on behalf of Nizick and/or POSC.

123. Nizick and POSC had an equal right to control the conduct thereof by specifying the type of people to be called, the questions and scripts that should be employed with prospective consumers, and how to write and execute contracts on behalf of Nizick and POSC.

124. Defendants had a duty to exercise due care when placing phone calls and marketing their services.

125. Defendants' violation of the TCPA is negligence per se.

126. Because of Defendants' negligence, Plaintiff suffered actual damages.

127. Nizick and POSC and John Doe are jointly and severally liable for the resulting damage.

## ACTING IN CONCERT

128. Defendants were part of a common design to robocall consumers and then sell Nizick and POSC's police officer services.

129. Nizick and POSC had a tacit understanding that John Doe was robocalling in violation of the TCPA.

130. Nizick and POSC knew that John Doe's conduct was a breach of duty to Plaintiff.

131. Nizick and POSC gave John Doe substantial assistance in accomplishing the tortious

result, including compensating John Doe for generating customers pursuant to robocalls and giving instructions on how to represent them and what to ask the people that had been robocalled.

132. Nizick and POSC furthered the tortious conduct by their cooperation with John Doe and adopted John Doe's robocalling and solicitation for their own benefit.

133. Nizick's and POSC's own conduct constitutes a breach of duty to Plaintiff.

134. Plaintiff's injury is indivisible.

135. All Defendants acted tortiously, and the harm resulted from the robocalling of John Doe to Plaintiff.

136. Nizick, POSC, and John Doe are joint and severally liable for the resulting damages.

**COUNT I – Telephone Consumer Protection Act – 47 U.S.C. § 227(b)(3)**

137. The acts of the Defendants constitute violations of the Telephone Consumer Protection Act.

138. Defendants' violations of the TCPA include, but are not limited to, the following:

   i. Making and/or initiating a telephone call using [] an artificial or prerecorded voice to any telephone number assigned to a cellular telephone service, in violation of 47 U.S.C. § 227(b)(1)(A)(iii).

139. As a result of Defendants' actions, under 47 U.S.C. § 227(b)(3), Plaintiff is entitled to an award of statutory damages of $500.00 for each such violation and an injunction prohibiting future conduct in violation of the TCPA.

140. Since Defendants' violations were committed willfully and knowingly, Plaintiff requests an award of statutory damages of $1,500.00 under 47 U.S.C. § 227(b)(3) for each such violation.

**Wherefore**, the Plaintiff requests judgment against each Defendant for:

17

1) Statutory Damages in the amount of $1,500 for "each such violation" pursuant to 47 U.S.C. § 227(b)(3);
2) Injunctive Relief to restrain and enjoin Defendants from initiating phone calls using artificial or prerecorded voice to cellular telephones with prior express consent.
3) Referral to the Texas Attorney General for prosecution under 47 U.S.C. § 227(g).

## COUNT II – Telephone Consumer Protection Act– 47 U.S.C. § 227(c)(5)

141. The acts of the Defendants constitute violations of the Telephone Consumer Protection Act, which provides an additional, distinct private right of action at § 227(c)(5).

142. Defendants' violations of the TCPA include, but are not limited to, the following:

   i. Placing more than one telephone call to Plaintiff's cellular phone without consent in violation of the TCPA regulations.
   47 U.S.C. § 227(c)(5).

143. As a result of Defendants' actions, under 47 U.S.C. § 227(c)(5), Plaintiff is entitled to an award of statutory damages of $500.00 for each such violation and an injunction prohibiting future conduct in violation of the TCPA.

144. Since Defendants' violations were committed willfully and knowingly, Plaintiff requests an award of statutory damages of $1,500.00 under 47 U.S.C. § 227(c)(5) for each such violation.

**Wherefore**, the Plaintiff requests judgment against each Defendant for:

1) Statutory Damages in the amount of $1,500 for each such violation pursuant to 47 U.S.C. § 227(c)(5);
2) Injunctive Relief to restrain and enjoin Defendants from calling telephone numbers on the National Do Not Call Registry;
3) Referral to the Texas Attorney General for prosecution under 47 U.S.C. § 227(g).

## COUNT III – TEXAS BUSINESS AND COMMERCE CODE § 305.053
## TEXAS STATE TCPA LAW

145. Texas Business and Commerce Code § 305.053 creates a right of action for "a person who receives a communication that violates [the TCPA as codified at] 47 U.S.C. Section 227 [or] a regulation adopted under that provision ... against the person who originates the communication ...." Tex. Bus. & Com. Code § 305.053(a).

146. Therefore, the elements of a § 305.053 claim "correspond to the necessary elements for a TCPA claim." *Callier v. GreenSky, Inc.*, No. EP-20-CV-00304-KC, 2021 U.S. Dist. LEXIS 126769, 2021 WL 2688622, at *6 (W.D. Tex. May 10, 2021).

147. Plaintiff is entitled to an award of at least $500 in damages for each such violation under § 305.053(b)(1).

148. Plaintiff also requests the Court award treble damages based on Defendants' knowing and/or intentional violations under § 305.053(c)(1).

149. Plaintiff also seeks a permanent injunction requiring Defendants to cease placing illegal telemarketing calls.

**Wherefore**, the Plaintiff requests judgment against each Defendant for:

1) Statutory Damages against Defendants in the amount of $1,500 for each violation of the Telephone Consumer Protection Act (and the regulations adopted thereto) pursuant to § 305.053(c)(1);
2) Permanent Injunction restraining and enjoining Defendants from placing illegal telemarketing calls.
3) Injunctive Relief to refer the Court's findings to the County District Attorney for criminal prosecution under Texas Business and Commerce Code § 305.051 and 305.052.

## COUNT IV – TEXAS BUSINESS AND COMMERCE CODE § 302.101
## FAILURE TO OBTAIN TEXAS REGISTRATION CERTIFICATE

150. Texas Business and Commerce Code § 302.101 require telemarketers to obtain a registration certificate ... for the business location from which the solicitation is

19

made.

151. Texas Business and Commerce Code § 302.101 states that a person (1) "may not make a telephone solicitation" (a) "from a location in [Texas]" or (b) "to a purchaser located in [Texas]," (2) "unless the [person] holds a registration certificate for the business location from which the telephone solicitation is made." Tex. Bus. & Com. Code § 302.101(a).

152. Defendants do not hold a registration certificate.

153. Plaintiff may exercise a private right of action under Tex. Bus. & Com. Code § 17.50.

154. Plaintiff seeks an award of $5,000 per violation per Tex. Bus. & Com. Code § 302.302(a).

155. Plaintiff seeks a permanent injunction requiring Defendants to cease placing telemarketing calls to residents of Texas without a registration certificate.

**Wherefore**, the Plaintiff requests judgment against each Defendant for:

1) Statutory Damages of $5,000 per violation pursuant to Tex. Bus. & Com. Code § 302.302(a);
2) Costs and attorney fees pursuant to Tex. Bus. & Com. Code § 302.302(d);
3) Permanent Injunctive Relief to restrain and enjoin Defendants from placing telemarketing calls to residents of Texas without a registration certificate.

The Plaintiff,
Christopher Laccinole

/s/ *Christopher M. Laccinole*
Christopher M. Laccinole
14356 N. Summerchase Cir.
Willis, TX 77318
chrislaccinole@gmail.com
401.783.0762